IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PAUL CAPUTO,

      Plaintiff,

vs.                                                                       No. CIV 05-321 JB/DJS

RIO RANCHO POLICE DEPARTMENT,
LEMUEL MARTINEZ, OFFICER J. MELTON,
MICHAEL BAKER, Chief of Police,

      Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the Defendants Rio Rancho Police Department, Officer J. Melton, and Michael Baker's Motion for Summary Judgment and to Dismiss, filed January 4, 2006 (Doc. 33). The Court held a hearing on this motion on April 26, 2006. The primary issue is whether the Defendants seized Plaintiff Paul Caputo in violation of the Fourth Amendment to the United States Constitution. Because the Court concludes that Caputo was not seized in violation of the Fourth Amendment, the Court will grant the motion.

**FACTUAL BACKGROUND**

On November 6, 2003, Caputo observed a car traveling through his neighborhood in a way that Caputo believed was dangerous. See Complaint ¶ 10, at 2, filed March 24, 2005 (Doc. 1). Upon witnessing the vehicle, Caputo stepped into the street and "flagged the car down." Id. Once the vehicle had stopped, Caputo identified himself as a "retired police officer." Videotaped Interview of Paul Caputo at 6:21-22 (taken December 5, 2003).

Michael Lizzi, the driver of the stopped vehicle, believed that Caputo was a police officer "just

by the way he was acting and the way that he was." Deposition of Michelangelo Lizzi at 18:22-24 (taken January 5, 2006). Lizzy believed that Caputo was an off duty police officer. See id. at 18:24-19:3. At the time of the stop, Lizzi was in the car and Caputo approached from the driver's side. See Deposition of Paul Caputo at 278:10-12 (taken January 4, 2006)(hereinafter "January 4 Caputo Depo.").

During the encounter, Caputo pulled out his wallet and showed the occupants an identification card and a badge. See Videotaped Interview of Paul Caputo at 11:8-11. Caputo asked for Lizzy's name and identification. See id. at 6:18-23; January 4 Caputo Depo. at 279:5-10. Caputo told them that they did not have to stay there and that he did not have any authority to hold them there. See January 4 Caputo Depo. at 281:1-7. Lizzy's driver responded by handing his driver's license to Caputo; the passenger said he did not have any identification. See Videotaped Interview of Paul Caputo at 7:9-11; January 4 Caputo Depo. at 279:7-15. Caputo gave Lizzy his license back after three or four minutes. See January 4 Caputo Depo. at 283:13-20. Caputo warned Lizzy about driving in an unsafe manner and let the two young men go on their way. See Videotaped Interview of Paul Caputo at 9:1-10.

Lizzi reported the incident to the Rio Rancho Department of Public Safety ("RRDPS") on December 4, 2003. See Offense/Incident Report at 1-4. He stated that, on November 6, 2003, Caputo had stopped him while driving and "got out his wallet and opened it to display a badge and a card with a photo that said police." Statement of Probable Cause at 1. At the time of the incident, Caputo held a reserve deputy sheriff's officer commission from the Sheriff of Sandoval County and was retired from RRDPS. See Deposition of Paul Caputo at 24:21-23 (taken October 5, 2005)(hereinafter "October 5 Caputo Depo.").

On December 5, 2003, then-RRDPS Chief Michael Baker telephoned Caputo to ask him to come to the police station.  See Complaint ¶ 12, at 3.  While at the police station, Caputo gave a videotaped interview in a cubicle; Melton was the only other person in the room with Caputo.  See generally Videotaped Interview of Paul Caputo at 2:4-10; January 4 Caputo Depo. at 228:15. Caputo states that he did not feel free to leave while at the station.  See January 4 Caputo Depo. at 229:2-5.  During the interview, Caputo stated that he showed the occupants his Sandoval County Reserve Deputy Commission and that they may have seen his retired RRDPS officer badge.  See Videotaped Interview of Paul Caputo at 9:19-21, 11:10-11.

Caputo also represented that reserve officers are not authorized to make traffic stops and that they were authorized to act out of uniform when "there was a felony in [their] presence or something violent that was going to endanger life.  Otherwise, [reserve deputies were required] to be on duty, in uniform, logged in before . . . enforcing general laws or serving civil papers." Id. at 127:2-22.  It is unclear from the transcript whether Caputo was speaking about the Bernalillo County Sheriff's Department reserve officer program, or the one in Sandoval County.  See id. at 125:1-127:22. Caputo does not deny that he was speaking about Sandoval County, but he does deny that Sandoval County reserve deputies are not allowed to make traffic stops; he asserts that reserve deputies can make traffic stops but not sign traffic tickets.  See Deposition of Sheriff John Paul Trujillo at 17:8-19:8 (taken January 5, 2006)(hereinafter "Trujillo Depo.").

At the RRDPS station, Melton served Caputo with a search warrant that authorized Melton to seize "[i]tems that resemble or are in fact Law enforcement badges and identification.  Also badge holders commonly used by commissioned Officers to display their status as Law Enforcement personnel."  Affidavit for Search Warrant at 1 (executed December 5, 2003)(hereinafter "Search

Warrant Aff."). The Honorable Mary Humphrey, Magistrate Judge, signed the warrant. See Search Warrant at 1.

Before the interview, Caputo gave his wallet to Melton, who photographed the wallet and its contents. See Photos at 1-2. Inside the wallet, Melton found a metallic badge bearing the words "Retired Officer," "Rio Rancho," and "Department of Public Safety." Photos at 1-2. Melton also found and photographed an identification card that bore the words "Retired Police." Id. The badge and the identification card were held in a brown leather wallet that had a cut-out to display the badge and a clear plastic window to display the identification card. Id.

Melton used "aggressive" language before the interview. See January 4 Caputo Depo. at 227:7. He told Caputo: "What the fuck were you doing?"; "Who the hell do you think you are?"; "Why would you pull this shit?" Id. at 227:4-7. Caputo asked Melton if he wanted to hear his version of the events, and Melton said: "If you want to give me your side of this, then we can go into the interview room, and you can give me an interview." Id. at 228:11-13. Caputo responded: "Fine, let's do it." Id. at 228:14.

Caputo agrees with the Defendants that a retired RRDPS officer has no law enforcement authority beyond that of any private citizen. See October 5 Caputo Depo. at 178:21-179:3. The Standard Operating Procedures for the Sandoval County Sheriff's Office Reserve Deputies 116.8(C) states: "Reserve deputies when **off duty shall not have any status as a Deputy Sheriff or Peace Officer or shall not represent, identify or hold himself/herself out to be a Deputy Sheriff or Peace Officer** unless an emergency arises in which his or her assistance is immediately required." On January 15, 2004, Melton swore a Statement of Probable Cause setting forth the findings of his investigation and a Criminal Complaint setting forth the charges at issue in this case. See Statement

of Probable Cause at 1-2; Criminal Complaint at 1. Melton does not mention, in either the affidavit for the search warrant or his investigative report, that Melton was a reserve deputy sheriff's officer at the time of the stop. See Search Warrant Aff. at 1-2; Investigative Report at 1-2.

Thereafter, a Criminal Summons issued to Caputo. See Criminal Summons. On June 11, 2004, a nolle prosequi was entered. See Nolle Prosequi at 1.

## PROCEDURAL BACKGROUND

On March 24, 2005, Caputo filed his Complaint, alleging that the Defendants unlawfully seized him and his property in violation of the Fourth Amendment, that the Defendants maliciously prosecuted him, and that Rio Rancho Police Department had a policy, custom, practice, or procedure that led to the violation of his rights. See Complaint ¶¶ 22-42, at 4-7. On June 30, 2006, the Court dismissed Defendant Lemuel Martinez on the basis of absolute prosecutorial immunity. See Memorandum Opinion and Order, filed June 30, 2006 (Doc. 64).

On January 4, 2006, the other Defendants filed a motion for summary judgment and to dismiss, because the Defendants did not violate Caputo's constitutional rights, the Defendants are entitled to qualified immunity, and Caputo has not stated a claim under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), against Rio Rancho Police Department. See Defendants' Memorandum at 4-15, filed January 4, 2006 (Doc. 34). In his Response, Caputo argues that a reasonable person would not have felt free to leave the police station, that the Defendants are not entitled to qualified immunity, and that the Rio Rancho Police Department is liable under the "single incident" theory. Response at 9-18, filed February 22, 2006 (Doc. 53). Caputo also voluntarily dismisses his claim for malicious prosecution. See id. at 11.

**STANDARDS FOR DETERMINING MOTIONS FOR SUMMARY JUDGMENT**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. Id. at 249-50 (citations omitted). Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988). The Court may only consider admissible evidence when ruling on a motion for summary judgment. See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

If a defendant seeks summary judgment, it has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case." Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995))(internal quotations omitted). Upon meeting that burden, the plaintiff must "identify specific facts that show the existence of a genuine issue of material fact." Id. (citations and internal quotations omitted). "The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (citations and internal quotations omitted). The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by

the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted).

## **LAW REGARDING THE FOURTH AMENDMENT**

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Under the Fourth Amendment, governmental officials have seized a citizen when "a reasonable person would have believed that he was not free to leave." Jones v. Hunt, 410 F.3d 1221, 1225 (10th Cir. 2005)(quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988))(internal quotations omitted). The United States Court of Appeals for the Tenth Circuit has set forth several factors to "guide" the seizure analysis:

> 1) the threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects . . .; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed place; 8) and absence of other members of the public.

Jones v. Hunt, 410 F.3d at 1226 (quoting United States v. Hill, 199 F.3d 1143, 1147-48 (10th Cir. 1999))(internal quotations omitted). These factors are neither dispositive nor exclusive. See id. (citations omitted). Instead, the Tenth Circuit looks at the totality of the circumstances. See id. (citing United States v. Shareef, 100 F.3d 1491, 1505 (10th Cir. 1996)). "When viewing the totality of the circumstances, it may be that the strong presence of two or three factors demonstrates that a

reasonable person would have believed that he was not free to terminate an encounter with government officials." Id. "[T]he particular personal traits or subjective state of mind of the [person allegedly seized] are irrelevant to the objective reasonable person test . . . other than to the extent that they may have been known to the officer and influenced his conduct." United States v. Hill, 199 F.3d at 1149.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the legitimate "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982)(quoting Butz v. Economou, 438 U.S. 478, 506 (1978)). Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). In the specific context of qualified immunity, the United States Court of Appeals for the Tenth Circuit has stated:

> We review summary judgment decisions involving a qualified immunity defense somewhat differently than other summary judgment rulings. In our prior decisions, we have emphasized that once a defendant raises a qualified immunity defense, the plaintiff bears a heavy burden. The qualified immunity defense cannot be analogized to other affirmative defenses because of the interests implicated in suits against government officials. Unlike other affirmative defenses, qualified immunity not only shields a defendant from liability, but is also intended to protect the defendant from the burdens associated with trial.

Hannula v. Lakewood, 907 F.2d 129, 130 (10th Cir. 1990)(citation and internal quotations omitted).

When a government official asserts the defense of qualified immunity, the burden shifts to the plaintiff to establish: (i) "that the defendant's actions violated a constitutional or statutory right"; and (ii) "if the plaintiff establishes a violation of a constitutional or statutory right, he must then

demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct." Medina v. Cram, 252 F.3d 1124, 1128 (10th Cir. 2001)(citations and internal quotations omitted). "If the plaintiff fails to carry either part of [the] two part burden, the defendant is entitled to qualified immunity." Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995).

## **LAW REGARDING MONELL CLAIMS**

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

The Supreme Court of the United States has recognized that "municipalities and other bodies of local government are 'persons' within the meaning of this statute." St. Louis v. Praprotnik, 485 U.S. 112, 121 (1988). The Supreme Court has articulated "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy." Id. at 123 (citation omitted).

> First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, that is, acts which the municipality has officially sanctioned or ordered. Second, only those municipal officials who have final policymaking authority may by their actions subject the government to § 1983 liability. Third, whether a particular official has final policymaking authority is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.

Id. (citations and internal quotations omitted).

The Tenth Circuit has explained that there are two elements that a plaintiff must show when "suing a county under section 1983 for the actions of one of its officers": (i) "a municipal employee committed a constitutional violation"; and (ii) "a municipal policy or custom was the moving force

-9-

behind the constitutional deprivation." Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d 1313, 1318 (10th Cir. 1998)(citing Monell v. Dep't of Soc. Servs., 436 U.S. at 694); Hinton v. City of Elwood, 997 F.2d 774, 782 (10th Cir. 1993)(citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986); Apodaca v. Rio Arriba County Sheriff's Dept., 905 F.2d 1445, 1447-48 (10th Cir. 1990); Watson v. City of Kansas City, 857 F.2d 690, 697 (10th Cir. 1988)). Those elements apply when the plaintiff alleges that the acts of a final policymaker are the policy of the municipality. See Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d at 1319 ("The defendants do not deny that Sheriff Sharp, as the supervising law enforcement officer, was a final policymaker with respect to the decision to enter the apartment. Thus, there is no dispute in this case that the County, through Sheriff Sharp, was the 'moving force' behind the decision to enter the apartment. If that decision--the decision to enter the apartment--resulted in a constitutional violation, the County would be liable." (citation omitted)).

## ANALYSIS

The Court will grant the Defendants' motion for summary judgment, because there is no genuine issue that Caputo's constitutional rights were not violated. Specifically, the police's actions did not implicate Caputo's Fourth Amendment rights, because he was not in custody. Without showing a constitutional violation, Caputo is also unable to defeat qualified immunity and cannot sustain his Monell claim.

### I.     **CAPUTO WAS NOT IN CUSTODY.**

A seizure under the Fourth Amendment does not occur until a reasonable person would have believed that he was not free to leave. See Jones v. Hunt, 410 F.3d at 1225. The Court must look at the totality of the circumstances to determine whether a Fourth Amendment violation has taken

place. See id. at 1226.

Caputo alleges that he was unlawfully seized when Melton "held" him for questioning at the police station. Response at 8-11. To carry its initial burden of showing an absence of evidence to support Caputo's case, see Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164, the Defendants point out that the police *asked*, and did not order, Caputo to come to the station for questioning. Complaint ¶ 12, at 3.[1] Caputo, therefore, came into the police station for the interview of his own volition, creating a consensual encounter that did not implicate the Fourth Amendment. See United States v. Lopez, 443 F.3d 1280, 1283 (10th Cir. 2006). Neither party appears to dispute that Caputo was not placed under arrest while at the police station. See Summary Judgment Memorandum at 6; Response at 8-11. Furthermore, as a voluntary encounter, the police needed no level of suspicion to question Caputo. See Cortez v. McCauley, 438 F.3d 980, 989 (10th Cir. 2006)(citing Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000)). Without facts showing that Caputo's time spent in the police station escalated from a consensual encounter into an investigative detention or an arrest, Caputo has not shown a violation of the Fourth Amendment.

Because the Defendants met their initial burden, Caputo must highlight specific facts that show the existence of a genuine issue of material fact. See Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164. Caputo points to six facts that, he contends, establish that a reasonable person would not have felt free to leave the police station: (i) Melton used aggressive language that indicated to Caputo that he had to comply with Melton's requests; (ii) the questioning was in an enclosed space; (iii) no members of the public were present; (iv) Caputo was at the police station; (v) Melton was

---

[1] Although the Complaint states that Baker "called" Caputo into the police station, Caputo's response admits that Baker asked Caputo to come into the police station. See Summary Judgment Memorandum at 3; Response at 1.

-11-

armed; and (vi) Caputo faced the search of his home if he did not come to the station.[2] See Response at 10.

These facts, taken together, do not raise a genuine issue whether a reasonable person would have felt free to leave. While Melton used aggressive language prior to the interview – "What the fuck were you doing?"; "Who the hell do you think you are?"; "Why would you pull this shit?" – he clearly gave Caputo the option of interviewing with him or declining to participate further in the encounter, depending on which option Caputo preferred: "If *you want* to give me your side of this, then *we can* go into the interview room, and *you can* give me an interview." January 4 Caputo Depo. at 227:4-228:13 (emphases added). Caputo then consented to continue the encounter: "Fine, let's do it." Id. at 228:14.

Caputo next points to the particular circumstances of the interview itself: it was in an enclosed space and no members of the public were present. Caputo has not explained why these two facts make this particular interview so coercive as to make a reasonable person feel unfree to leave. In any event, the Court has viewed the digital video disc of the interview and finds no evidence that would create a genuine issue on this point. First, the recording shows that Melton did not block Caputo's path to the door; instead, the door was behind Melton on Melton's left. See Paul Caputo Interview. At least on the video, far from being aggressive or dominating, Melton frequently slouches, leans back

---

[2] In the first place, the Court cannot find support in the record for the contention that Caputo faced a choice of either coming to the police station or enduring a search of his home. Caputo did not cite to any evidence to support this argument. See id. Nor is there any evidence that the Court could find, independent of the parties' lack of citations, that the police threatened Caputo with a search of his house if he did not voluntarily go to the police station. In their briefs and at the hearing, however, the Defendants appeared to have conceded that Caputo did face such a choice. See Transcript of Hearing at 7:1-4 ("If Mr. Caputo had decided that, no, he did not need to voluntarily provide any information, then he could have let the officers come and execute on their search warrant.").

-12-

in his chair, and puts his arms around his head. See id. Melton's tone is always courteous, and he does not raise his voice at Caputo. See id. Melton does not appear to be in uniform, but appears to be dressed casually in a shirt and jeans or khakis. See id.

Caputo does not explain why his presence in the police station transformed the encounter into an arrest, especially given that Caputo voluntarily came to the police station. The quotation from Miranda v. Arizona, 384 U.S. 436 (1966), that Caputo uses to justify such an inference on the basis of his presence at the police station alone – "It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the *compelling atmosphere inherent in the process of in-custody interrogation* is not necessarily present," id. at 478 (emphasis added) – assumes that a suspect is in custody in the first place; in this case, Caputo has not presented evidence to show that he was in custody, which could then create the compelling atmosphere of which Miranda v. Arizona spoke. Furthermore, the place in which a person is questioned does not necessarily determine the nature of the police-citizen interaction. See United States v. Hill, 199 F.3d 1143, 1148 (10th Cir. 1999)(citation omitted)("While the bus may have been a more confining and cramped environment than other locations, the Supreme Court and this court have held repeatedly that the location of the encounter is but one factor in the totality of the circumstances."); United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990)("Miranda warnings are not imposed because the questioning is conducted in a certain place, i.e., a patrol car, or because the person being questioned is suspected of having committed some offense. The relevant inquiry is how a reasonable [person] in the suspect's position would have understood [the] situation." (alterations in original)(internal quotations and citations omitted)).

While Caputo contends that Melton was armed – a fact for which there is no citation to the

record, and which was not visible on the video – Caputo does not argue that Melton used his weapon in any kind of threatening manner. See Response at 10. Finally, Caputo asserts that the possibility that his house would be searched made his encounter with the police a seizure. See id. At most, Caputo is arguing that *he* did not feel free to leave; Caputo produces no facts that show that a reasonable person would not have felt *free to leave the police station*. Instead, taking the facts in the light most favorable to Caputo, a reasonable person would have known that he was free to leave the police station at anytime, even if that meant that his house would be searched.

Considering the totality of the circumstances, there is no genuine issue that a reasonable person would have felt free to leave. The police asked Caputo to come to the station; Melton offered Caputo the opportunity to interview, to which Caputo consented; the interview was free of any sign of coercion; Caputo did not make known his desire, if it existed, to leave. Based on this evidence, Caputo's unlawful seizure claim must fail.

## II.     CAPUTO'S PROPERTY WAS NOT UNLAWFULLY SEIZED.

Caputo contends that the police seized his property at the police station in violation of the Fourth Amendment. To meet their burden, the Defendants point out that Melton seized the property pursuant to a searched warrant that Judge Humphrey signed. See Search Warrant at 1. The badge and identification card that Melton took were the items described in Melton's affidavit: "[i]tems that resemble or are in fact Law enforcement badges and identification. Also badge holders commonly used by commissioned Officers to display their status as Law Enforcement personnel." Search Warrant Aff. at 1. The warrant was supported by Melton's oath and an affidavit describing with particularity the items that Melton seized. See Search Warrant Aff. at 1-2. The affidavit sets forth sufficient facts for Judge Humphrey to find that probable cause existed to search for items used in

impersonating a police officer and false imprisonment; the affidavit recounted the incident on November 6, 2003, between Caputo and Lizzi. See Search Warrant Aff. at 1-2.

In his response, Caputo makes no argument to rebut these facts, which is his burden once the movant shows an absence of evidence. See Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164. Because the Defendants have met their burden of showing an absence of evidence, and Caputo has not attempted to present specific facts that create a genuine issue, the Court will grant summary judgment to the Defendants on this claim.

### III.    CAPUTO DISMISSED HIS MALICIOUS PROSECUTION CLAIM.

In his Response, Caputo stated: "Plaintiff voluntarily dismisses his claim for malicious prosecution against Defendants Baker, Melton and the City of Rio Rancho." Response at 11. At the hearing, Caputo's counsel indicated that he did not have any further information on that claim. See Transcript of Hearing at 11:1-5.

### IV.    BAKER AND MELTON ARE ENTITLED TO QUALIFIED IMMUNITY.

Baker and Melton have raised the defense of qualified immunity. When a government official asserts the defense of qualified immunity, the burden shifts to the plaintiff to establish: (i) that the defendant's actions violated a constitutional or statutory right; and (ii) if the plaintiff establishes a violation of a constitutional or statutory right, he must then demonstrate that the right at issue was clearly established at the time of the defendant's unlawful conduct. Medina v. Cram, 252 F.3d at 1128. Because Caputo has not established that the Defendants' actions violated a constitutional or statutory right, for the reasons explained above, qualified immunity protects Baker and Melton from suit.

## V.     CAPUTO'S MONELL CLAIM ALSO FAILS.

Caputo alleges that RRDPS can be sued under Monell for the act of a single employee – Baker – when that employee has final policymaking authority and uses it to deprive another of his constitutional rights. See Response at 16. In this case, Caputo contends that Baker participated in the allegedly unlawful behavior and therefore instituted an unconstitutional policy against Caputo. See id. at 17.

While Caputo is correct that the acts of a single employee can sometimes give rise to a Monell claim, see St. Louis v. Praprotnik, 485 U.S. at 121, such a Monell claim still requires that a constitutional violation occurred, see Myers v. Oklahoma County Bd. of County Comm'rs, 151 F.3d at 1318; Hinton v. City of Elwood, 997 F.2d at 782. Caputo does not dispute that this is a correct statement of the law:

> THE COURT: If I found that there was no violation, no seizure under the Fourth Amendment here.
>
> MR. SILVERBERG: I think that eclipses the Monell argument. There has to be at least something to hang -- we have to have something to hang our hat on, and that would be the seizure claim. I don't think that it would get to the level of constitutional dignity and getting to the Monell realm if the Court found that no reasonable juror could find that there was a seizure here.

Transcript of Hearing at 15:22-16:5. Because Caputo has not established a genuine issue that his constitutional rights were violated, the Monell claim is no longer tenable, and the Court will grant the Defendants' request to dismiss this claim.

**IT IS ORDERED** that Defendants Rio Rancho Police Department, Officer J. Melton, and Michael Baker's Motion for Summary Judgment and to Dismiss is granted.

-16-

                                                                  _____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Herbert Silverberg
Mary Lou Boelcke
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Randy S. Bartell
Carolyn A. Wolf
Montgomery & Andrews, P.A.
Santa Fe, New Mexico

    *Attorneys for Defendants Rio Rancho Police Department, Jeramy Melton,*
      *and Michael Baker*